United States v. Angel Paz-Alvarez and 13-2101 United States v. Luis Morero Morero. Thanks. Good morning, Your Honors. Good morning. If it pleases the Court, Ms. Raymond Rivera, I represent the appellant Angel Paz in this case. Your Honor, this is a case where Mr. Angel Paz, to begin with, I'd like to reserve two minutes if possible. Yes, you may. It will be deducted from your opening time. This is where Mr. Paz, he is basically hired to perform certain work. The work that he is to perform is to work on existing and, in part, to construct a secret compartment on a boat, on a vessel, which is to be used to illegally or conceal drugs per the person who hired him instructions. And that would be a Mr. Retaman. The problem here is that although he may have been aware of the illegality to which his work was to be put, he never really joined that conspiracy and he never had the intention of joining that conspiracy. Well, counsel, I could understand your argument better if there wasn't an obvious way of his knowing what the use would be that this construction would serve. The reason I don't find it easy to accept your argument is that, as I understand it, there is only one possible use for the construction that he was engaged in, and it was illegal use. So that there was nothing equivocal about his determination to do a job which he knew, which he had to know, was simply going to be used for an illegal, a criminal purpose. What is your response to my point about that distinction? Yes, Your Honor. He did know it was to be used for a legal purpose. But at the same time, a case law, in fact, direct sales, United States versus direct sales, has a footnote which succinctly and specifically addresses this issue, where it basically says that knowledge enough of the product to be put to illegal use is not sufficient to establish the joining of the conspiracy. Was that a case, and I simply don't remember clearly from the time I prepared here, was that a case in which the only possible use was an illegal one, or was it a case in which the particular work might have gone for a legal purpose, might have gone for an illegal purpose? Yes, Your Honor. Basically, that was a case that dealt with direct sales. Because it was a mail order house, and they basically were selling drugs to this doctor. And what the drugs saw in that case was is that there was actually direct sales would incite, would promote, would want to sell more drugs. And those were controlled substances, and even though they did fill out the required forms in order to be able to distribute those drugs, they arrived at the conclusion that it basically went beyond a normal course of business dealing. In that case, basically the supplier was giving discounts to the doctor so that the doctor would even buy more. The doctor was distributing something like 6,000 doses a month when basically the normal doctor would have, what, 150 or 200 doses a month. But in that case, what they do is when they start defining, they actually get into it and they say, hey, in certain situations here, knowledge, you can actually, if I may read the quote, and I have it right here. What page are you on? And it's basically, it's on page 17 of my brief, and it basically says, single or casual transactions not amounting to a course of business regular, sustained and prolonged, and involving nothing more on the seller's part than acquiescence in his desire to purchase, for whatever end, a considerable degree of carelessness coupled with casual transactions is tolerable outside the boundary of conspiracy. But you're not dealing here with a casual, single casual transaction, or a sale of a product. I mean, the distinction that's being made in direct sales is that ordinarily it is legal, lawful to sell drugs to a doctor who's an authorized recipient, right? But this isn't a single casual event, as I understand the government's evidence. The defendants in this case constructed a number of these secret compartments, these clavos, which as Justice Souter pointed out, had no legal or lawful purpose. Yes, that is correct. But the transactions that really occurred and the work that was performed was performed in a span of time of three months. And how many of these compartments were built that your defendant participated in? Okay, actually they built three compartments, but one of those three compartments was even decommissioned. But that's not something that your client knew about when he accepted the job to build it. I'm sorry, that he knew about... That he knew it was never going to be used. He knew what was going to be used, but what he did not, and he never did have the intention was of joining that conspiracy. What happens here is that the benefit of the product coincides with furthering the objectives of the conspiracy. And it doesn't further the objectives of the conspiracy to build secret compartments to secrete the drugs so they can be imported more easily? Yes, it does further the objectives of the conspiracy, but his intent was basically the construction of those secret compartments. Counsel, excuse me, in your brief you use the phrase a lot, you say that your client was indifferent to the success or failure of the conspiracy. I gather that your argument, yes, they knew what was going on, they understood how these clobbers would be used. But from their point of view, it was just a job. They're contractors, they're carpenters, they build things. They were asked to build this type of compartment. And whether it furthered the objectives of the conspiracy just didn't matter to them. And because, as you put it, they were indifferent, they did not have an intention to further the objectives of the conspiracy. Is that basically? Their intention was to complete the work to which they were contracted. Okay, well, if that, sorry, please go ahead and finish your answer. And the intent of not joining the conspiracy is also clearly born when he is in fact invited to join and to go pick up some drugs and he says no. I mean, that simply means it was a high-risk operation and he didn't want to get into the high-risk operation. It doesn't mean one way or the other that he wasn't a member of the conspiracy. Well, Your Honor, I think the fact that he was never seen again, the fact that he was never actually seen again from that date on, I think bears that he really, really had no interest in joining and being part of that conspiracy. Or that the conspirators wanted no part of him once he declined to take part in the high-risk operation. Well, that really never came up during trial, but what did come up was that they never really communicated after that, and they made their approach before that. He never really visited these meetings where drugs were discussed. No. The meetings that he had actually consisted of the work orders which he was to perform. Okay. Thank you, Counsel. You have some rebuttal time. Good morning, Your Honor. Javier Morales on behalf of Luis Marrero Marrero. May it please the Court. Your Honor, this case, Luis Marrero relied on the Burgos case in his defense. The holding that we use from Burgos is very similar to direct sales in the sense that there are certain defenses. As stated by Brother Counsel Rivera, the footnote number eight in direct sales talk about casual transactions in the plural. It does not limit the actions to one specific time. So it would be improper to say that if these people did more than one clavo, one more than one compartment, that it is not covered by direct sales or Burgos. Because specifically, direct sales says a considerable degree of carelessness, coupled with casual transactions is tolerable outside the boundary of conspiracy. The question before the Court as to direct sales and Burgos is, is direct sales still good? Is Burgos still good law? That's the main question. Because we have relied upon those cases for our defense. The whole thing in this case was based on this particular defense. If you take a look at the proceedings, you see problems from the indictment. We have spoken when we have written in our brief that there's a defect in count one of the indictment. It says, as part of the definition of a count one, that it says defendant along with associates. Count one talks about a defendant has associates. You have a jury that takes that indictment into the jury deliberation room, reading defendant and his associates. And there you have a guilty by association. Did you object to the district court letting the jury have the indictment in the jury room? No, Your Honor. We did present a motion letting the court know that that language was there, and he denied our motion. But there's no assignment of error in your brief. Not as to them taking it into the jury room. Okay. So you have that. Coupled with the noble introduction by the government of their idea that the mere construction of these compartments is illegal per se. Totally wrong. That statement by the government was adopted by the court. The court also found that these things were illegal per se. Particularly when we were talking with the judge in one of the conversations, an appendix page 356. The court stated, and I quote, when you facilitate, when you accept a job like that, knowing that the boats are going to be used for drug trafficking, you are joining the conspiracy. Maybe I missed this in the brief. The judge said that to the jury? No. This was on the side. Okay. But it lets you see where the judge is coming from and how his mind. The question is still, is it not? Are you getting to your jury instruction argument that the judge erred in the jury instructions because the judge, from your point of view, did not properly instruct on the issue of intent to further the conspiracy? I am getting there, but what I am giving you is what transpired on the sidebar. Okay. And you can see from this quote what is in the mind of the judge and how his point of view is clouded to the effect that he eliminates the intentional aspect of the elements of conspiracy. Well, you say that, but that would be problematic only if what you described, you said at sidebar, found its way into the jury instructions and led to an error in his instructions. And I'm trying to understand what the error is in his instruction. If you go to page 430 of the appendix, after the judge was finishing giving the jury instructions, he spoke about the quantities that he wanted the jury to decide. A statement by the judge said, how much cocaine is involved in this conspiracy? And he said, this is the only thing that I want you to tell me, more than five or less than five. Let me repeat that and listen to it. How much cocaine is involved in this conspiracy? He's telling the judge there is a conspiracy here, and he has taken the element of the existence of the conspiracy from the jury. But prior to that, he has made clear, he's explained to them what a conspiracy is, and he has explained to them what they have to find beyond a reasonable doubt in order to conclude that your client was engaged in a conspiracy. So that statement precedes the statement that you're quoting now. But the thing is that by denying our request for instructions on intent, he did not clarify to the judge the intent aspect of the case. What I presented to the judge was straight from Burgos. This is not something new that appeared for the first time in the recent case that this honorable court presented last December. But what's wrong, what I don't understand from your brief, or from your argument, is what, I looked at what Judge Fuste told the jury about intent. And what's wrong with that? I understand that you wanted a more extensive, more elaborate instruction, a more focused instruction. But I think under our case law, you're not entitled to that so long as he instructed on the element in a legally sufficient manner. But he did not, because he did not cover the two-pronged aspect of willful. In this case, he had to tell the jury that the prosecution had to prove that there was intent to join and an intent to effectuate the activities of the conspiracy. Counsel, let me, if I might, quote this language to you. This is from Judge Fuste's instruction. He's explaining what the elements of a conspiracy are, what the jury has to find in order to conclude that your client engaged in a conspiracy. And he says, acting knowingly and willfully, I already told you, means to do something that the law forbids. It means to act voluntarily and intelligently and, and this is a critical language I would suggest, and with a specific intent that the conspiracy be successful. Now, that's not the language that you proposed to him, but what else does that mean other than there had to be a specific intent on the part of your client and Mr. Paz that the conspiracy be successful, that they wish to further the objectives of the conspiracy. Isn't that what that means? Well, if the instruction about joining in and intention to effectuate the objects were presented, we could have been in a better position to present to the jury that there were no, the intent. First of all, the, you have to see everything, it's not separate, okay. You cannot separate the Burgos case and the direct sales case that supports our arguments from the lack of instructions that would allow us to better present to the jury that our clients did not have the intent. Why? Because we have specific cases that said what I just spoke to, I just quoted. See, another short, very short quote from direct sales, there may be also a fairly broad latitude of immunity for a more continuous course of sales, in this case sales of services made either with strong suspicion of the buyer's wrongful use or with knowledge, but without stimulation or active incitement to purchase. These persons didn't go there asking for a job, they were called and they did the job, okay. See, direct sales gives us that defense, Burgos basically recites the same thing and if we would have that, our instructions presented to the jury, we could go to those instructions and tell the jury, look, you heard the instruction or you will hear the instruction, okay. Casual transactions like the ones that you have here can be immune because you don't have the intent. They did their job, they were paid for that and they left. But why were you unable to make that argument under the instructions that Judge Lopez has just referred to and quoted from? You're not entitled to the exact language you want, you are entitled to an instruction that accurately covers the law. And what is it in the instruction that Judge Lopez has referred to that failed to cover the law and made it impossible for you to make the argument that you refer to? Because he did not allow us to present the Burgos defense. I'm sorry. I was not able to present the Burgos defense. Basically, the Burgos, I could say that there was no intent to promote the conspiracy. They did not make it their own. No, but right here, as Judge Lopez has already read, the judge said, actingly and knowingly, I told you, means to do something the law forbids. It means to act voluntarily and intelligently and with a specific intent that the conspiracy be successful. That's what you wanted to argue, and it seems to me that instruction supports your right to argue it. What is the error? It was insufficient because he did not allow us to present the indifference defense, the fact that they did not have a stake in the conspiracy. Why can't you present an indifferent defense under instruction that says it means to act with a specific intent that the conspiracy be successful? You can say we were indifferent. That does not mean with an intent for success of the conspiracy. You could make that argument. But he wouldn't have the same weight, Your Honor. Thank you. Good morning, Your Honor. Good morning. Counsel for Mr. Paz presents to this court that Mr. Paz was not concerned as to the success of this smuggling venture. However, the facts that were presented in trial say it's different. First of all, Mr. Paz and Mr. Marrero, they both came into this conspiracy when the other conspirators were increasing in their business. They were moving from doing 100 kilograms transactions. Now they are ready to do a 5-kilogram transaction. There's evidence all over during the trial that the reason why Mr. Retamar, which was a co-defendant and was the first witness trial, hired them or contacted them was because he needed a bigger hidden compartment in one of the vessels that he had. It was for the contract of 500 kilograms. And is there evidence that the defendants knew that that's why they were being hired? Because the conspiracy was in progress and wanted to bring in larger amounts? Yes, Your Honor. And the evidence came during the first day of trial. It was the testimony of Mr. Retamar. And that part is on the record on page 137 of the appendix by Mr. Marrero, in which Mr. Retamar testified that when he hired them, he told them it was for a 500 kilograms hidden compartment. If I go straight to that page, it's 135. That was the first day of trial. Page 49 of the transcript in the appendix is 135. And it says, well, and what was the conversation between you and this individual as to the construction of the hidden compartment? Well, we talked to him and we told him that we needed a compartment that will hold like 500 kilograms we will be transporting. That conversation is in the context of smuggling drugs. He keeps talking during his testimony and on the same page, page 49 of the first day of trial, which is 135, then it continues. Okay, let's take that step by step. You directly talked with that person? Right. Yes. And you requested that person to build a hidden compartment? That is so. What did you tell him was going to be used, that hidden compartment for? Well, to transport. To transport what? Kilos. Kilos of what? Of drugs. Of drugs. That is so. In what amount? 500 more or less. So it was clear on the very first meeting that they had, they were hired just to assist the conspirators in moving 500 kilograms or more. Now, there's additional evidence during the trial. Like, for instance, at some point, a CBP officer who happens to be 10 years of experience in doing seaport interdictions, he was with the anti-terrorism smuggling group, he's been trained to look for hidden compartments. This individual testified that when he found the hidden compartment, which was difficult for him, he had to go inside the hidden compartment, he's a normal person, and then take the 150 kilograms of cocaine that were in different sacks. So the hidden compartment was big enough to have that particular CBP officer and the drugs and allow him movement in order to push those sacks up so other officers will take them. So it was specifically told to them that it was made big enough that 150 kilograms were there. In addition, a CBP officer, I think that there's no doubt that they knew what they were doing for. They knew the amount, they knew that it was going to be given to that hidden compartment. But they apparently, what we've heard this morning, is that the defendants admit that. And they say, well, we didn't join the conspiracy, we didn't care whether they succeeded or not, we were doing this carpentry job and they paid us for doing it, and what they did with our work product isn't our problem. That's basically the argument they're making, and they say that the Supreme Court's decision in direct sales and this Court's decision in Burgos validates that argument. So that's what you've got to confront. The problem is that that's not only what happened in this case. After they built the first hidden compartment, they have a meeting in which both Paz and Marrero Marrero went to explain the operation of the hidden compartment. During that meeting, it's very important that when they get together, it's Marrero Marrero, Angel Paz, Mr. Retamar, two other individuals that were part of the conspiracy known as Kino and Pablo. They were talking as to the operation, but when Mr. Paz went to discuss exactly how it worked, he observed that there was another individual that he did not trust, the one that is referred to as Moncho, which happens to be an individual that was working for the government at the time, Mr. Retamar. Nobody knew he was working for the government, and he was recording what was going on. So Mr. Paz lowered his voice and he asked that Moncho would be stepped out. So it has been trying to be presented as that the air conditioner was not working properly because after he asked Moncho to step out, he asked Mr. Marrero Marrero to close the door. The only reason why he wanted to do that is because he wanted to make sure of the success of the operation. If he will talk in front of other individuals that he did not completely trust, that could have been told to the police officers of the ages, and that could have compromised the whole operation. So it's not as simple as I was hired to build a cabinet or a hidden compartment. It was I was hired, I knew what was for, I did it, I did it right, I explained to this individual the use, and now I don't want other people to know what's going on here because that will compromise the operation. I mean we're really talking about a jury question, but you could read that conduct very differently. I mean they know what's going on. They know it's dicey stuff. They don't want to get caught up in an illegality, and so sure they worry about other people being around who might be in a position to get them in trouble, but that doesn't necessarily mean they want to further the objective of the conspiracy. It could mean that, but not necessarily. Well, what are the reasons? If he's not involved in this and he's an innocent, just plowmaker for lack of a better word, he couldn't care what happened or who knows. Quite the contrary, he should want that everybody knows how his piece of art works because then the word is going to spread out and more people will hire him. You're right, it may be a question for the jury, but it's so difficult to believe what the defendants pretended to show to the jury that they were not interested in the success of the conspiracy because they tried at that moment to make sure there was going to be a secret. No people away from the ones that were working together were supposed to know because then eventually they can be caught. So that is an indication, and I am presenting that to the court, to show that it's not as simple as they did a job and walked away. They did a job, they wanted to make sure it was going to work, they wanted to make sure they were not going to get caught. There were other meetings in which they also participated, and it's very important because when they are coming to do the second work, the first one was done in this vessel that they had the sea trial and they explained the operation. Later on, about a month or so, they are asked to go back and do another secret compartment, and at this time they go to an area in Puerto Rico that is now Palmas del Mar. There is a marina over there and the vessel was there. Well, they go on November the 10th, they go inside the vessel, they work in that vessel. There is a meeting the next day in which they did not participate, but on November the 12th, Mr. Rectamarek goes again to the marina. There were pictures taken and presented to the jury during the trial. Mr. Rectamarek goes to see the other hidden compartment that was built, and there is another meeting, one is in Humacao, the other is in the parking of Ponderosa Restaurant in Puerto Rico in Fajardo. In that meeting, the testimony of Mr. Rectamarek was that they were discussing the operation of the hidden compartment and they were talking also as to the smuggling venture that was going to take place in St. Croix, the one for the 500 kilograms. If they were not concerned as to the success of the operation, the smuggling venture, if they were just individuals doing their job, nothing to do with importation, why they are in that other meeting, the November the 12th meeting. So I believe that that position that has been presented, that these individuals had no interest in the results of the conspiracy, is not supported by the evidence at trial. Moreover, and this touches the other point as to the intent and the instruction of the intent, is that the judge, as has been discussed, the judge specifically instructed as to the specific intent of these individuals, and the quote that was presented is on page 427 of the appendix for Appellant Marrero Marrero. But that's not the only point in which the judge talked about the specific intent. The judge also talked as to the specific intent on page 423, in which the judge, it says, acting willfully is doing something which the law forbids with a specific intent that the act be done and carried out. So again, the judge is one more time telling the jurors that these individuals, in order to be found guilty, they need to show specific intent in the success of the operation. It's not just a simple, I did this and I walk away. So the jurors were instructed into that, and the jurors made the decision that in fact, they were not just bystanders doing a hidden compartment, that they had to maintain the success of the operation, and that's what the jury found. Counsel, I wonder if I might ask you a question. This is a jury instruction question. It goes to how the district court handled the drug quantity issue. It does seem to me that the district court handled it in a rather odd way. Now, this is not, as you point out, this is not Delgado, and yet the drug quantity issue is presented to the jury as kind of an afterthought. The judge goes through the elements of conspiracy, then goes on to discuss sort of some housekeeping items about how the jury should conduct itself, and then says at the end of the instructions, I also am asking you another question, and then he refers to drug quantity. Now, the concern in Delgado was that given the way it was handled there, the jury would not understand that drug quantity is actually an element that has to be found beyond a reasonable doubt. Doesn't this instruction have some of the same problems in that it is presented as a question distinct from the elements of the conspiracy offense? There is no reference back to the need to address quantity beyond a reasonable doubt. So why, at least why aren't the concerns that were present in Delgado, why aren't they also applicable here, although this is not as extreme a case as Delgado? Yes, I agree with the court. This is not the same case as Delgado, and the difference, the way that I see it, is that I read the instructions and the instructions as the judge is provided the instruction. There's almost every paragraph or every two paragraphs the judge is instructing them as to every decision that they have to do in this case has to be beyond reasonable doubt. That instruction, first of all, excuse me, the verdict first asks whether or not they are guilty or not guilty, and whether they are guilty, if they are found guilty, then the next step is what determines if there's more than five or less than five. There's no reason for this juror to think that they have to treat this second part of the analysis in a different way. Because the judge, and if we go to the instruction, we basically have pages in which reasonable doubt is mentioned. For instance, in appendix 416 is page 84 of the instructions. You know, the judge mentions reasonable doubt basically in every single paragraph. And he says proven beyond reasonable doubt, establishing beyond reasonable doubt, the charge beyond reasonable doubt, the charge beyond reasonable doubt, reasonable doubt, proof beyond reasonable doubt is sufficient. You know, it's on and on and on and on, the same instruction over and over and over. I don't see any problem for this juror to think that their duty was less important or that they were required to use less evidence, weight of the evidence to make that decision. On top of that, you know. Counsel, in fairness both to the government and to the defendants, and I'm not being critical that you're apparently not aware of it, you all should be aware that there's a decision of this court that came out during the last week of December. It's called United States versus Melendez. I think that it sheds considerable light on this question. It involved virtually the same situation. And so I invite the government and the defense counsel within one week, if they choose to do so, to send us a 28-J letter, not to exceed three pages per party, as to what relevance, if any, they think that the Melendez decision should bear with respect to our decision in this case. Very well, Your Honor. I will pass that information to my office and we will provide the 28-J letter. So to conclude my point, the other aspect that I want the court to consider is that this is not a case in which there may be any questions as to whether or not there were five kilograms of drugs or more. Because at this point, they are dealing only, as to these two defendants, only with the same request. They came here for 500 kilos, 500 kilos, 500 kilos. When there are any numbers that are below 500, the witness is testifying as to prior drug ventures in which either he participated himself or the seizure of 150 kilograms. But at any point that there's any reference as to the participation of these two defendants, it's always 500 kilos. And it's the same evidence, the same weight of evidence. So that's why we submit, Your Honor, in this case, there was no really possibility that if the jurors believed they were guilty, that they could have come with any decision other than it was more than 500 kilos. It's the weight of the evidence. The standard of review here is plain error? Excuse me? Was there an objection below to the failure to give a specific beyond a reasonable doubt charge linked to drug quantity? I don't remember that being presented at trial, Your Honor. I do not remember. But if there was no such objection, obviously our standard of review was plain error. That's correct. Okay. May I have a moment? Anything more, counsel? I believe that I have addressed all the main issues that were presented by the defendants. Unless there's any specific questions, there's nothing else. Okay. We thank you. Thank you. Mr. Rivera, you had some rebuttal time? Yes, Your Honor. Okay. Very briefly, I'd just like to indicate that a brother counsel here makes reference to C trials, which was to try out the worthiness of the vessel for drug smuggling ventures. It's very respectfully noted that at no time was either of the defendants on any C trials, even though that was represented to a grand jury that came out later, that they were not. And they never did get on a boat to participate in any C trials. Also, there's no evidence as to whether they knew or didn't know that the C trials were being undertaken? No. They really had nothing to do with that. Okay. Yeah. Okay. And then another matter is that a brother counsel makes reference to a meeting in Fajardo, which was to discuss the drug venture. And if I understood correctly or incorrectly, I think he indicated that Mr. Paz and Mr. Marrero were present. And that also came out during trial, specifically that they were not present. In fact, the reason they were not present was because they were working in Humacao. And this was in Fajardo, which is another city. Okay. That's helpful. It's another matter. Also, he talks about the meeting which was recorded where there was work being done on the clavo. And he talks about not trusting Moncho. That in itself is also indicative that he was not a part of the conspiracy. Also, it came out of trial. The problem, Mr. Rivera, with that and with so much else in this case, is that there's a great deal of evidence here which could support inferences either way. Yes. The fact that he didn't trust Moncho and wanted him out of the meeting could support your position. But it also could bear the interpretation that the prosecutor gives it. And that's what we have juries for, isn't it, when evidence will bear interpretations either way? Yes, Your Honor. But a major, gigantic flaw with the jury instructions was that the Honorable District Judge did not leave any leeway for someone who had knowledge of a conspiracy to not be part of that conspiracy. And the case law that I saw direct sales and that Brother Counsel Marrero cited specifically states that while knowledge is essential for intent, knowledge in itself does not equate to joining of a conspiracy or the intent to join. Thank you. Thank you all.